UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Henry Kaleta,

        Plaintiff,

v.                                                                 Civil No. 12-170 (JNE/FLN)
                                                                   ORDER
Samantha Johnson and Trevor Johnson,
Acting in their individual capacities as officers
of the Minnetonka Police Department,

        Defendants.

      Plaintiff Henry Kaleta ("Kaleta") brought suit against Defendants Officer Samantha

Johnson ("Samantha") and Officer Trevor Johnson ("Trevor"), alleging claims under 42 U.S.C.

§ 1983 of unlawful seizure and excessive force in violation of his Fourth Amendment rights.

The Defendants moved for summary judgment on all claims.

## I.      BACKGROUND[1]

      In the early afternoon of July 17, 2011, Kaleta was the victim of a minor hit-and-run

accident that occurred in the parking lot of a Target store in Minnetonka.  Kaleta, a sixty-four-

year-old man, had recently purchased a red 2006 Chrysler 300.  At the time of the accident,

Kaleta was sitting in his parked car when another car bumped into him and then drove away.

Kaleta got out of his car, circled it to assess the damage, and then waved his arms and shouted

"stop, you hit me," in an attempt to stop the driver of the other car.  When the other car did not

---

[1]      The facts described below are undisputed or are those that a reasonable fact-finder could
find when viewing the record in the light most favorable to Kaleta.  The Court notes, however,
that there are five video recordings of the incident—three recordings from Target's security
cameras, one recording from the camera mounted in Officer Trevor's squad car, and one
recording from the camera mounted in Officer Samantha's squad car.  Only the recordings from
the two squad cars contain audio.  Where Kaleta's version of events is "so utterly discredited" by
the video recordings of the incident, the Court will view the facts as depicted by the video
recordings.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

stop, Kaleta got back in his car and drove off in an attempt to follow the driver of the other vehicle, who Kaleta believed to be female. He circled around the Target parking lot for approximately ten minutes looking for the other vehicle, to no avail.

A witness observed Kaleta's behavior and called 911, reporting that there was a man outside Target who was talking to himself, acting strangely, chasing a woman on foot through the parking lot, and driving in circles in the parking lot. Officers Trevor and Samantha were dispatched to Target. The message from dispatch stated:

> . . . described as a sixty-plus-year-old white man wearing, um, a flowered, a bright flowered shirt. Apparently has been acting strange walking back and forth in front of target and chasing a female on foot. They also got into a red Chrysler 300 and drove that around the parking lot. Last seen at the parking lot in the vehicle, no plate information. . . . They've seen this male prior . . . walking back and forth, talking to himself, acting strangely . . .

Officer Trevor arrived first at Target, and when he pulled into the parking lot, he immediately spotted Kaleta's vehicle. Officer Trevor followed behind Kaleta, with his lights and sirens off. Kaleta continued to circle around the parking lot, traveling between parked vehicles, crossing the white lines of several parking spaces, and crossing over rows of parking spaces. As Kaleta approached an intersection and slowed down, Officer Trevor activated his lights, at which time Kaleta stopped his vehicle. The officer prepared to exit his squad car, but then Kaleta resumed driving, turning back around into the parking lot and stopping in a parking space.[2] Kaleta then pulled forward again and drove a few feet farther before finally coming to a stop. It was at this time that Officer Samantha arrived.

Upon stopping, Kaleta immediately exited his car and angrily yelled "what is your problem?" while approaching the officers, attempting to explain to them the hit-and-run

---

[2]     Kaleta testified that he "drove maybe 50 feet or something and then parked my car," because he was "right at the exit" and wanted to give the officers "more space." Kaleta Dep. 22:2-12.

accident.[3]  It is undisputed that Kaleta's hands were empty.  Officer Trevor exited his squad car

with his gun drawn, yelling for Kaleta to "stay right there, stay right there."  Officer Trevor

testified that he could not see Kaleta's hands for the first few seconds after Kaleta exited his

vehicle and began approaching the officers, due to the angles at which the cars were parked

relative to one another.  After Officer Trevor could observe Kaleta's empty hands, he stated that

he could still not be sure Kaleta was not a threat because "someone could have things hidden in

their waistband."  Trevor Dep. 54:8-9.  Officer Samantha exited her squad car with her Taser

drawn, also shouting for Kaleta to "stay right there."  She testified that although she could see

that Kaleta's hands were empty, she still could not tell whether or not he was armed because he

was wearing "a large, baggy Hawaiian style shirt" and she had "no way of knowing if he had

anything tucked in his waistband or pocket."  Samantha Dep. 32:18-20, 40:10-12.

      Kaleta did not immediately respond to the officers' commands and continued to approach

the officers for a couple of seconds before eventually stopping near the rear bumper of his

vehicle.[4]  Officer Trevor shouted for Kaleta to "turn around, turn around," but Kaleta did not

immediately follow this command either.  Officer Trevor then yelled "put your hands on the car,

turn around, put your hands on the car."  Kaleta then began turning toward his vehicle, but did

not fully turn to face his car and did not place his hands on the car.  Officer Trevor then holstered

his weapon and Officer Samantha warned "turn around or I'll Tase you, turn around now."  At

---

[3]     The officers testified that Kaleta yelled "what the fuck is your problem."  The Court will
assume for purposes of this motion that no profanity was involved.  The officers also testified
that Kaleta approached them "aggressively."  While Kaleta disputes that he was "aggressive," he
does not contend that he was calm or relaxed in his approach.  He testified, in fact, that he was
angry because of the hit-and-run incident immediately preceding the encounter with the police,
and that he was "angry with the officers" when he yelled "what is your problem?"  Kaleta Dep.
24:20-22; 36:24-25.

[4]     Kaleta concedes that he was "slow to respond," and that perhaps he did not hear the
officers' orders because he was trying to simultaneously tell them about the hit-and-run.

that point, Kaleta turned partially toward his car and put one hand on the trunk of the car, but turned back around to continue talking to the officers.[5] Officer Trevor attempted to grab Kaleta's right arm to restrain and handcuff him, at which point Kaleta "reared back" and "resist[ed] it." Kaleta Dep. 39:1-7. Kaleta's arm came free and he turned to fully face the officers. Officer Samantha deployed her Taser while yelling for Kaleta to "get on the ground." The Taser did not achieve the desired neuro-muscular effect and Officer Trevor quickly thereafter deployed his Taser. Kaleta then fell on his hands and knees to the ground.

Once Kaleta was on the ground, Officer Trevor ordered him to lie on his stomach, and Officer Samantha ordered, "get on your stomach now, otherwise we're going to Tase you again." Without Tasing him, Officer Trevor then rolled Kaleta over onto his stomach and handcuffed him. The officers repeatedly told Kaleta to relax, and then Officer Trevor asked whether Kaleta was diabetic—to which he responded that he was. The officers sat Kaleta up on the pavement and asked again whether Kaleta was diabetic, and Kaleta responded that he was not.[6] The officers then asked Kaleta about his behavior as observed and as reported to them, and Kaleta informed them that he was the victim of a hit-and-run accident in the parking lot.[7]

---

[5] Kaleta characterizes his behavior as "largely" compliant, but does not contend that he fully complied with the officers' orders. He also concedes that he only put one hand on his trunk. *See* Pl.'s Mem. Opp. Summ. J. 10 (stating that Kaleta "largely complied" and "put one hand on his trunk," and that he "tried to comply" but may not have heard some of the officers' commands).

[6] Kaleta testified that he initially told the officers he was diabetic "just to razz them, give them a hard time." Kaleta Dep. 57:5-7.

[7] In his brief, Kaleta emphasizes the fact that he was diagnosed with Huntington's Disease by a genetic test fifteen years ago. He states in his brief that he was "essentially symptom-free prior to the subject incident," and that he has been showing symptoms "since around July 2011." Pl.'s Mem. Opp. Summ. J. 3-4 (ECF No. 17). Kaleta testified on September 27, 2012, however, that he is "not showing the signs yet of Huntington's disease," and that his diagnosis has not "really affect[ed] me on a daily basis." Kaleta Dep. 7:21-25, 8:22-24. Kaleta's wife also

Paramedics were called to the scene. Kaleta was kept handcuffed outside until the paramedics arrived and replaced the officers' handcuffs with their own.[8] The driver of the ambulance, Randy Lundeen, testified that generally if a patient is handcuffed when the paramedics arrive on the scene, the paramedics will keep him handcuffed. Mr. Lundeen also testified that if a patient is exhibiting bizarre behavior and if there is any potential for the patient becoming agitated or out of control, the paramedics might handcuff the patient for the safety of the patient and the paramedics. Mr. Lundeen did not remember enough about the incident to recall whether or not Kaleta had been acting in such a way as to indicate that things might "go bad" during transportation. Lundeen Dep. 22:1-23:2. The other paramedic on the scene, Curtis Senn, testified that Kaleta was "acting very restless, very anxious," and was "acting kind of paranoid . . . was physically trying to grab at things . . . he kept on pacing in the ambulance, turning around, not saying anything, but just not really paying attention to what we were telling him." Senn Dep. 11:11-20. Mr. Senn stated that Kaleta's behavior "just seemed like he wasn't . . . with it" and that "it was bizarre" and "not normal for the situation." *Id.* 11:21-12:6. Mr. Senn testified that because of Kaleta's behavior, they decided to restrain Kaleta during transportation.[9] Kaleta was then brought to the hospital where his injuries were assessed.

---

testified that she had not seen him exhibit signs or symptoms of Huntington's disease in July 2011. Julie Kaleta Dep. 7:1-4, 22-24. There is no evidence to support Kaleta's implied assertion that this incident marked the beginning of his symptomatic experience with Huntington's Disease, nor is there any evidence that the officers were or should have been aware of the diagnosis.

[8]     Kaleta notes that he was handcuffed for seventeen minutes after the paramedics arrived, before the paramedics switched to their own handcuffs.

[9]     Kaleta asserts that Mr. Lundeen's testimony refutes that of Mr. Senn, and that for purposes of this motion, the Court should consider only Mr. Lundeen's testimony regarding Kaleta's behavior. Mr. Lundeen, however, testified that he did not remember the incident enough to recall Kaleta's behavior and whether his behavior warranted restraint during

## II.    DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party must substantiate his allegations by "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation marks omitted).

Kaleta asserts § 1983 claims against Officers Trevor and Samantha in their individual capacity. Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. Because § 1983 is "not itself a source of substantive rights," a court addressing a claim pursuant to § 1983 must "identify the specific constitutional right allegedly

---

transportation. Kaleta did not testify about his behavior in the ambulance, other than that he believes he was cooperative with the paramedics. Kaleta Dep. 55:25-56:1. Thus, there is no evidence to create a genuine dispute of material fact with regard to Mr. Senn's recollection of Kaleta's behavior.

infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Kaleta alleges that Officers Trevor and Samantha violated his right to be free from unreasonable seizures and excessive force. Defendants contend that they are entitled to qualified immunity.  "Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known."  *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To defeat a claim of qualified immunity, a plaintiff alleging excessive use of force must present sufficient facts to show that the officer's conduct violated a constitutional right, and he must also establish that the constitutional right was clearly established."  *Id.*

Kaleta's claim that Officers Trevor and Samantha violated his right to be free from excessive force and unreasonable seizures is evaluated under the Fourth Amendment objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under this standard, the appropriate inquiry is whether the "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Id.* at 397.  Kaleta asserts that there were five points in the encounter that constituted an unreasonable seizure or excessive force: (1) when Officer Trevor initially stopped Kaleta; (2) when Officer Trevor drew his weapon on Kaleta; (3) when Officer Trevor went hands-on with Kaleta to handcuff him; (4) when Officers Trevor and Samantha Tased Kaleta; and (5) when Officers Trevor and Samantha kept Kaleta handcuffed after learning of the hit-and-run incident.[10]

---

[10]     Kaleta offers in support of his opposition the affidavit of expert witness John J. Ryan. The Court gives no weight to Mr. Ryan's opinions regarding the reasonableness of the officers' actions, to the extent he gives such opinions, as this is a matter of law for the Court to decide. *See Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (stating that qualified immunity is a question of law and that the reasonableness of the officers' conduct in this context

## A. Reasonableness of the Initial Stop

Kaleta contends that Officer Trevor's initial stop was unreasonable because Officer Trevor did not have a reasonable suspicion of criminal activity. The Fourth Amendment protects people "against unreasonable searches and seizures." U.S. Const. amend. IV. "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003). The parties do not dispute that the stop made by the officers in this case was a seizure under the Fourth Amendment. The issue is whether the seizure was reasonable.

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "To justify a limited and momentary detention of a person without violating the Fourth Amendment's proscription against an unreasonable seizure, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Andrews v. Fuoss*, 417 F.3d 813, 817 (8th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Whether such a seizure is reasonable 'must be determined on the totality of the circumstances and is to be judged from the perspective of a reasonable officer on the scene without regard to the underlying intent or motivation.'" *Id.* (quoting *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999)).

---

is a legal conclusion that is for the court to make). The Court also gives no weight to Mr. Ryan's statements as to what was depicted in the videos and stated during the depositions, as such expert testimony would not be of assistance to the fact-finder. Even if it were to consider Mr. Ryan's affidavit in its entirety, it would not alter the Court's decision in this case, based on the undisputed facts presented.

An officer's stop of a vehicle is reasonable where the officer observes the driver driving erratically and has a reasonable suspicion that the driver may be impaired, believing that the driver may pose a "serious and immediate danger to himself and to others." *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003). Where the driver does not immediately stop for the police—even if the driver fails to stop because he is unaware that the police are pursuing him—a reasonable officer could believe that the driver is attempting to flee or resist arrest. *Id.*; *see also Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006) (finding that where the plaintiff drove erratically and dangerously and ignored the squad car's flashing lights and siren, the officer could reasonably suspect that the driver "posed a serious threat to public safety" and "had probable cause, indeed, a public duty, to stop the truck and arrest its driver").

Further, officers have a duty in their community caretaking capacity to conduct an investigatory stop to investigate a reported complaint. *See, e.g.*, *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (explaining that as part of their "community caretaking functions," police officers undertake activities to help those in danger and protect property and that these activities "are unrelated to the officer's duty to investigate and uncover criminal activity"); *United States v. Smith*, 162 F.3d 1226 (8th Cir. 1998). For example, the officers in *Winters v. Adams*, 254 F.3d 758, 760 (8th Cir. 2001), had received a complaint indicating that a possibly intoxicated person was observed exiting and reentering a parked vehicle. Although the officers admitted that they did not possess a reasonable suspicion of criminal wrongdoing when they initially approached the plaintiff's vehicle, the Eighth Circuit Court of Appeals held that "they were nevertheless justified in detaining appellee under the officers' 'community caretaking' function, in order to investigate appellee's physical and mental condition and competence to operate his motor vehicle." *Id.* at 762. Not only was the stop justified, but the

court held that the officers "'would have been derelict in their duties' had they not detained [the plaintiff]." *Id.* (citation omitted).

Here, before activating his lights and siren in an attempt to stop Kaleta, Officer Trevor had received a report that someone driving a red Chrysler 300 and matching Kaleta's description had been seen acting strangely, talking to himself, chasing a woman on foot through the parking lot, and driving around in circles. When Officer Trevor arrived at the Target parking lot, he immediately observed Kaleta's seemingly erratic driving, circling around the parking lot, crossing over rows of parking spaces, and driving between parked cars. Although Officer Trevor did not yet know whether or not any crime had been committed, from an objective standpoint the facts support a finding that he had a reasonable suspicion either of criminal activity or that Kaleta may pose a danger to himself or others. Given this set of facts, had Officer Trevor *not* attempted to stop Kaleta's car, Officer Trevor could well have been neglectful in his duties as a police officer. Thus, Officer Trevor's initial attempt to stop Kaleta's vehicle was reasonable. Further, once Officer Trevor activated his lights and siren, Kaleta did not immediately stop his vehicle. Instead, Kaleta stopped his vehicle, and then resumed driving and turned back into the parking lot. Then he stopped his vehicle again. And then he continued to drive several more feet. This "failure to yield" provided an additional basis for Officer Trevor's reasonable suspicion. *See* Minn. Stat. § 169.20, subdiv. 5 (requiring drivers to immediately yield to emergency vehicles that have their lights and sirens activated and classifying a failure to do so as a misdemeanor);[11] *see also United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (explaining that even

---

[11]    Defendants note that Kaleta's erratic driving in the parking lot could also have amounted to reckless or careless driving under Minnesota Statutes § 169.13, and that traffic violations provide an officer with probable cause to stop the driver of a vehicle. Section 169.13 explicitly applies within parking lots. Minn. Stat. § 169.13, subdiv. 3(a)(2).

innocent acts can create reasonable suspicion and "police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive").

In sum, stopping Kaleta's car constituted a seizure and was, under the totality of the circumstances, objectively reasonable.

## B. Excessive Force Claims

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (citations omitted). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Chambers*, 641 F.3d at 905 (internal quotation marks omitted). "Police officers undoubtedly have a right to use some degree of physical force . . . to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Id.* at 907 (citation omitted). "It remains firmly established that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Id.* (quoting *Graham*, 490 U.S. 396). "Resistance may justify the use of greater force." *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003). "If an officer reasonably, but mistakenly, believed that a suspect was likely to

fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

### 1. Drawing Firearm upon Stop

Kaleta contends that even if the initial stop was reasonable, it was unreasonable for Officer Trevor to immediately draw his weapon and point it at Kaleta because Kaleta was not a criminal suspect and was unarmed. An officer is justified in drawing his weapon when he is justifiably concerned for his safety and has not yet been able to ascertain whether the person being seized is armed or poses a danger to himself or others. *See, e.g.*, *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009). For example, where an officer observes a driver who is driving erratically and who does not immediately pull over after the officer activates the squad car's lights and siren, the officer may have reason to believe that the driver is driving while under the influence and attempting to avoid arrest for that reason or for some other illegal purpose. *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003). Under those circumstances, an officer is justified in drawing his firearm once the driver of the other vehicle has stopped, especially where the officer does not know if the driver is armed. *Id.*; *see also Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir. 1995) (stating that where a plaintiff fled from the police, an officer's "conduct in drawing his gun and pointing it at [the plaintiff], without any indication that [the officer] intended or attempted to fire the gun, does not rise to the level of a constitutional violation"); *Baird v. Renbarger*, 576 F.3d 340, 346-47 (7th Cir. 2009) (stating that "courts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police"); *Frison ex rel. Frison v. Zebro*, No. CIV.00-2688 PAM/JGL, CIV.02-523 PAM/JGL, 2002 WL 539069 (D. Minn. Apr. 5, 2002, *aff'd sub nom. Frison v. Zebro*, 339 F.3d 994 (8th Cir. 2003) (explaining that "[t]he mere pointing of a gun does not . . .

violate the Fourth Amendment . . . [a]bsent some evidence that the officer held the gun on [the plaintiff] for longer than reasonable").

Before exiting his car with his gun drawn, Officer Trevor had the following information: a witness reportedly observed Kaleta acting strangely, talking to himself, chasing a woman on foot through the parking lot, and driving in circles in the parking lot; Officer Trevor observed Kaleta driving erratically through the parking lot; Kaleta did not immediately stop his vehicle after Officer Trevor activated his lights and siren, but instead twice stopped and then continued driving before ultimately stopping; and upon stopping his vehicle, Kaleta immediately exited his vehicle and began approaching the officers, angrily yelling. Given the report of Kaleta's behavior, as well as the behavior observed by the officers, Officer Trevor was justified in being concerned for his safety and in drawing his weapon until he could assess what sort of threat Kaleta posed.

Kaleta argues that because he was unarmed and the officers could see that his hands were empty, Officer Trevor's drawing of his weapon was unreasonable. But "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001); *see also Ryder v. City of Topeka,* 814 F.2d 1412, 1419 n. 16 (10th Cir.1987) (concluding that, because a requirement that a suspect actually have a weapon would place police in "a dangerous and unreasonable situation . . . whether a particular seizure is reasonable is dependent on the 'totality of the circumstances,' and not simply on whether the suspect was actually armed"). Officer Trevor testified—and Kaleta does not dispute—that he could not immediately see Kaleta's hands upon Kaleta's exiting his vehicle, due to the angles at which the cars were stopped relative to one another. And although after a few seconds Officer Trevor could see that Kaleta's hands were empty, both officers testified that they still did not

know whether Kaleta was armed, because at the time he was wearing a baggy shirt and shorts in which a firearm could have been concealed, and he was standing in close proximity to his car. Kaleta offers nothing to dispute this, other than his own speculation that the officers should not have thought he was armed since his hands were empty and he made no attempts to reach into his shirt or waistband.

Unlike the cases Kaleta cites, *see, e.g.*, *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1014-15 (9th Cir. 2002), here, the officers were not in close proximity to Kaleta when Officer Trevor drew his weapon, it was not clear to the officers that Kaleta was unarmed, and it was unclear at the time whether or not Kaleta had been attempting to evade the officers or interfere with their duties. Based on (1) the strange behavior reported to the police officers, (2) the behavior the officers personally observed, (3) Kaleta's failure to immediately stop his vehicle when he saw the squad car's lights behind him, (4) Kaleta's quick exit from his vehicle once stopped, and (5) the fact that Kaleta not only began approaching the officers, but did so while angrily yelling, Officer Trevor's action in drawing his firearm until he could better assess the situation and ensure everyone's safety was reasonable under a totality of the circumstances.

### 2. Use of "Hands-On" Force and Handcuffs

Kaleta asserts that the officers' use of physical force in handcuffing him constituted excessive force. He contends that because his hands were empty and because there was nothing clearly suggesting that he was armed, Officer Trevor should have tried to first engage him in conversation before going "hands-on." "[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each

case." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011). It is well-established that "officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the *Terry* stop." *Id.*; *see also United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (explaining that while the officers "should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention," they "are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop" and that "use of handcuffs can be a reasonable precaution during a *Terry* stop to protect [the officers'] safety and maintain the status quo").

Kaleta relies heavily on *El-Ghazzawy*, 636 F.3d at 455, a case in which the plaintiff was suspected (wrongly) of trying to sell counterfeit watches and was located at a pawn shop. The court held that the officer's use of handcuffs on that plaintiff was unreasonable because there was nothing to indicate that the plaintiff was armed, the plaintiff was not suspected of a dangerous crime, the plaintiff exhibited no erratic or suspicious behavior, the officer failed to conduct a factual investigation prior to handcuffing and frisking the plaintiff, and there were no exigent circumstances. *Id.* at 457-58.

Here, however, the reports and observations of Kaleta's behavior *were* suggestive of danger, from the perspective of a reasonable officer on the scene—Kaleta was reported and/or observed to be acting strangely, chasing a woman on foot, and driving erratically, he failed to immediately stop for the officers, he quickly exited his vehicle and began approaching the officers, angrily yelled at the officers, and then he failed to comply with orders to turn around and place his hands on the car. The officers did not know if drugs, alcohol, or mental illness were playing a role in the situation, and Kaleta's behavior was not calm, controlled, or

predictable. And as previously explained, the officers also did not know whether or not Kaleta possessed a weapon, despite the fact that his hands were empty. Given the factual circumstances in this case, it was reasonable for the officers to believe that plaintiff was acting erratically or suspiciously, to be concerned that plaintiff posed a danger to himself or others, and that there were exigent circumstances present to warrant the use of handcuffs until the officers could control the situation.[12] *See, e.g.*, *Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006) (holding that where the plaintiff "finally stopped but failed to comply with orders to get out of his vehicle, it was objectively reasonable for [the officer] to pull [the plaintiff] from the truck and handcuff him").

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The Eighth Circuit "has declined to second-guess whether alternative actions by police officers 'might conceivably have been available.'" *Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (citation omitted). "The Constitution ... requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision." *Id.* (internal quotation marks omitted). "It may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard." *Id.* (internal quotation marks omitted). Thus, although the

---

[12]    Kaleta repeatedly refers to the fact that he was the victim of a hit-and-run, as an explanation for his behavior. He claims that given this backdrop, his behavior was not erratic—although he concedes that he was not calm and cooperative, either. Pl.'s Mem. Opp. Summ. J. 21. This, however, is exactly the type of hindsight bias that the Court must not employ. At the time, the officers had no knowledge of the hit-and-run, and based on his seemingly erratic behavior at the time from the perspective of a reasonable officer, it was reasonable for them to take physical control over the situation prior to engaging in conversation with Kaleta.

officers here could conceivably have first tried to engage Kaleta in friendly conversation regarding Kaleta's seemingly erratic behavior and failure to immediately obey police orders, they were under no clear constitutional obligation to do so. At the time the officers handcuffed Kaleta, they did not know what was causing his behavior, and he had given them sufficient reason to believe that handcuffs were necessary as a reasonable precaution to protect the officers' safety and maintain the status quo during the stop. Under the facts presented in this case, it was not unreasonable for the officers to apply the amount of force necessary to handcuff Kaleta prior to engaging him in discussion.

### 3. Officer Samantha and Officer Trevor's Use of the Taser

Kaleta argues that upon considering the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest, the officers' use of their Tasers was objectively unreasonable.

The Court agrees with Kaleta that the severity of the crime at issue, at least observable to the officers, was relatively minor. The only crimes implicated in Kaleta's encounter with the officers were possible traffic violations (e.g., reckless or careless driving through the parking lot), failure to yield, obstruction (by failing to follow the officers' commands), and obstruction with force (by failing to follow the officers' commands and resisting their attempt to handcuff him). The Court disagrees, however, with Kaleta's assertions that he "never posed a threat to the officers or others" and that he "did not attempt to evade arrest by flight or actively resist." Pl.'s Mem. Opp. Summ. J. 25-26. Moreover, the 911 call that led the officers to the scene was not motivated by minor traffic violations.

Kaleta states that because his hands were empty and because he never attempted to strike the officers, he never posed a threat to the officers or others. Kaleta concedes, however, that he did not immediately respond to or fully comply with the officers' orders. He also acknowledges that he got out of his car and approached the officers while angry and yelling. Kaleta further testified that when the officers attempted to handcuff him, he "reared back" and "resist[ed] it." It is undisputed that the officers could not tell whether or not Kaleta possessed a weapon, even after observing that his hands were empty, because he was wearing baggy clothing in which a weapon might have been concealed. After the officers attempted to handcuff Kaleta and Kaleta's arm came free and he turned toward the officers, the officers were in very close proximity to Kaleta. They had already received a report that Kaleta was seen acting strangely and chasing a woman on foot, and they personally observed Kaleta's erratic, unpredictable, and angry behavior. Under this set of facts, it was reasonable for the officers to believe at that time, without the benefit of hindsight, that Kaleta posed a threat to their safety, as well as the safety of himself and others.

Finally, while Kaleta concedes that he "reared back" when Officer Trevor attempted to handcuff him, he again argues that he did not try to physically hit the officer. He also emphasizes the fact that he did not try to flee from the officers. Kaleta's assertion that he did not resist the officers cannot be squared with the record evidence, including his own admission that he did resist. *See also* Kaleta Dep. 39:5-7 (Q: "You would agree with me that you resisted the officer's attempt to handcuff you?" A: "Yes."). When Kaleta reared back, his arm came loose from Officer Trevor's hold and Kaleta turned to face him. At that point, after warning Kaleta that he would be Tased, the officers had reason to believe that Kaleta was a threat and that

additional force was necessary to control the situation and ensure the safety of everyone involved.[13]

This is not a case where there is a nonviolent misdemeanant, who is not fleeing or resisting arrest, and who poses little threat to anyone's safety. *See Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (holding that the officer's use of a Taser was excessive when used against an "unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him"); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). Rather, Kaleta—who had been observed to be acting erratically and unpredictably—did resist arrest and the officers could reasonably believe that his actions posed an immediate threat to their safety, as well as the safety of Kaleta and others. This is precisely one of those situations in which the police officers were forced to make a split-second judgment under a tense, uncertain, and rapidly evolving situation. In hindsight, the officers may have been able to subdue Kaleta and control the situation without deploying their Tasers, although even with hindsight that is not certain. But "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And while "[i]t may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard." *Estate of Morgan*, 686

---

[13]     Kaleta repeatedly emphasizes the fact that he is in his sixties, as if that factor should outweigh all of the other information available to the officers. He cites no law, however, for the proposition that it is unreasonable for an officer to handcuff or use a Taser on a sixty-plus-year-old man who is angry, acting erratically, disobeying police commands, and resisting the officers' attempt to handcuff him. *See, e.g.*, *Brown v. Cwynar*, 484 Fed. App'x 676, 680 (3d Cir. 2012) (holding that it was objectively reasonable for the officer to use physical force and use a Taser to subdue a seventy-three-year-old man, reported to be a disruptive customer in a store, who resisted arrest and refused to comply with police orders). A sixty-plus-year-old man, despite his age, may nevertheless pose a serious danger to himself or others. And the video images show Kaleta to be vigorous and not apparently infirm in any way.

F.3d at 497.  The Court concludes that the officers' use of their Tasers in order to subdue Kaleta

and control the situation, after warning Kaleta that he would be Tased if he did not comply, and

after Kaleta actively resisted their less forceful attempt to handcuff him, was not objectively

unreasonable.[14]

## C.  Duration of the Seizure and Handcuffing

Kaleta argues that the length of his detention made the seizure unreasonable.  He asserts

that he was kept handcuffed outside, on a humid ninety-degree day, throughout the entire

incident, even after the officers learned that Kaleta was the victim of a hit-and-run incident and

was unarmed.  Kaleta does not provide the Court with information regarding how long he was

handcuffed overall, but states that he was handcuffed for "17 minutes after the paramedics

arrived, and after [Defendants] learned he was a crime victim, not a suspect."  Pl.'s Mem. Opp.

Summ. J. 23.  It is not clear from the record how soon the paramedics arrived after the handcuffs

were placed.  Kaleta contends that once the officers learned that he was the victim of a hit-and-

run, then there was no longer a "law enforcement purpose" for the stop because Kaleta was a

---

[14]     The Court notes that there appears to be a disconnect between the way in which lawyers
perceive the use of Tasers and the way law enforcement perceives the use of Tasers.  For
example, in Kaleta's brief, he characterizes a Taser as "a very high level use of force."  Pl.'s
Mem. Opp. Summ. J. 24; *see also id.* (describing the pain caused by and the risks associated with
the use of a Taser and stating that "[a] taser is a significantly violent level of force" (internal
quotation marks omitted)).  Kaleta's attorney repeatedly suggests during the depositions of the
police officers that it would have been better for the officers to physically take-down Kaleta after
he resisted their "soft empty hand" attempt at handcuffing him, rather than deploying their
Tasers.  Officer Trevor, however, testified that a physical takedown can be more violent and
cause greater injury than a Taser.  *See* Trevor Dep. 36:16-25, 37:20-38:4.  Officer Samantha
testified that in the force progression training provided to police officers, a Taser is just one step
above a "soft empty hand" and is a step below a "takedown" or a "hard empty hand."  Samantha
Dep. 51:24-52:11.  She also testified that the higher level "takedown" or "hard empty hand"
techniques would be considered a higher level of force and more likely to cause injury.  *Id.*; *see
also id.* 55:19-57:4.

victim, not a suspect.  He further asserts that because he never tried to strike anyone and did not threaten physical harm on anyone, there was no justification for keeping him handcuffed.

"A detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention."  *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005).  When assessing the reasonableness of the length of a *Terry* stop, the Court must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  "[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."  *Id.*

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 686-87 (citations omitted).

Kaleta relies heavily on *United States v. Acosta-Colon*, 157 F.3d 9 (1st Cir. 1998), for his assertion that the duration of handcuffing was unreasonable.  In *Acosta-Colon*, the First Circuit Court of Appeals explained that because there was "no suggestion that any one of the suspects was being uncooperative, belligerent, or showed any perceptible inclination to put up resistance or become violent," and because the officers had no "*actual* suspicion that Acosta was armed or otherwise presented an appreciable danger," the handcuffing was unreasonable.  *Id.* at 19.  The

court further noted that when a suspect is handcuffed based on a suspicion that he is armed, the restraints are normally removed following a pat-down revealing the absence of weapons. *Id.* at 19 n.13. The court also found the duration of the detention to be unreasonable, because the officers did not take any investigatory actions to confirm or dispel the suspicions upon which the detention was based.

The facts in the present case are significantly different than those in *Acosta-Colon*. Here, Kaleta had been uncooperative, angry, and admittedly resisted the officers' attempt to handcuff him. The fact that the officers eventually learned that Kaleta had been the victim of a hit-and-run did not resolve the law enforcement purpose of the stop, because the hit-and-run was not the purpose for the initial investigatory stop—the purpose for the stop was to investigate a report of a man acting strangely and driving erratically in the Target parking lot. When the officers arrived at the parking lot, Kaleta continued to act strangely—he did not immediately stop his vehicle, he got out of his vehicle and angrily approached the officers, he did not fully and immediately comply with police orders, and he resisted their attempt to handcuff him. The officers did not believe that being the victim of a hit-and-run would explain Kaleta's conduct, and believed that something else, perhaps a medical problem, was involved.

During the time Kaleta was detained, the officers *did* investigate the reason for the stop and the reported suspicious behavior—they viewed the surveillance videos from Target, they called the paramedics, they spoke with Kaleta about the hit-and-run, and they tried to ascertain whether there was some other factor that could explain Kaleta's behavior. There is no evidence that the officers were not diligent in their investigation or that they should have required fewer than seventeen minutes to investigate the behavior for which they were called to the scene and which they personally observed upon encountering Kaleta. *See, e.g.*, *United States v. Maltais*,

403 F.3d 550, 557 (8th Cir. 2005) (explaining that "[t]here is no evidence that any of the law enforcement officers were dilatory in their investigation or that there was any unnecessary delay"). In fact, the one paramedic who recalled Kaleta's behavior also reported that Kaleta was acting restless, anxious, and paranoid, even after the paramedics arrived. He testified that once in the ambulance, Kaleta was physically trying to grab at things, pacing around, and seemed like he was not "with it." The mere fact that Kaleta had been the victim of a hit-and-run does not suggest that there was no longer a valid law enforcement purpose for the stop. And the fact that Kaleta did not try to strike anyone or overtly threaten physical harm does not mean that the officers could conclude that Kaleta did not pose a threat to himself or others, especially given his erratic and angry behavior. *Cf.*, *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) (finding it reasonable to detain a handcuffed suspect in a squad car for twenty minutes after the suspect became agitated in order to protect the officers' safety and maintain the status quo). Finally, the officers handcuffed Kaleta in order to subdue him and control the situation—not because they necessarily suspected he was armed—and so they were not obligated to remove the restraints upon learning that Kaleta was unarmed.

Overall, the officer's continued use of handcuffs for seventeen minutes after the paramedics arrived and after learning that Kaleta had been the victim of a hit-and-run was not objectively unreasonable and did not constitute a *de facto* arrest.

In sum, the Court concludes that Officers Trevor and Samantha did not deprive Kaleta of his Fourth Amendment right to be free from unreasonable seizures or excessive force. Because he was not deprived of his constitutional rights, the Court need not proceed to the second prong of the analysis—whether the right was clearly established. Defendants are entitled to qualified immunity and summary judgment in favor of Defendants is warranted in this case.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.  Defendants' Motion for Summary Judgment [Docket No. 11] is GRANTED.

2.  Summary judgment is granted in favor of Defendants on all claims.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 8, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge